**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-60157-CR-HURLEY**
**CASE NO. 17-60002-CR-HURLEY**

**UNITED STATES OF AMERICA**

**v.**

**LEE ROBERT MOORE,**

     **Defendant.**

_____/

**UNITED STATES' SENTENCING MEMORANDUM**

**I.     Introduction**

Defendant Lee Robert Moore is scheduled to be sentenced on Thursday, May 18, 2017. On March 1, 2017, Defendant pled guilty to Count Three of the Indictment in Case No. 16-60157 (the "Florida case"), charging him with enticing a minor to engage in sexual activity.   On the same day, he also pled guilty to Count One of the Indictment in Case No. 17-60002 (the "Delaware case"), charging him with sending obscene material to a person under the age of 16.   On May 4, 2017, Defendant filed his objections to the PSR, primarily arguing that the pattern of activity adjustment and the obstruction of justice adjustment should not apply.   Subsequently, on May 10, 2017, Defendant filed a withdrawal of his objection regarding the obstruction of justice adjustment. Consequently, this memorandum responds to the lone remaining objection that pertains to the pattern of activity adjustment.

Additionally, this memorandum explains the United States' sentencing position.   First, scientific research shows that the victims in this case are now at a substantially elevated risk for all manner of deleterious health consequences ranging from increased alcohol abuse to suicide attempt to premature mortality.   Second, Defendant's military and public service history should

not be a mitigating factor, and, indeed, should arguably be an aggravating factor.   Third, a sentence significantly above the minimum is reasonable under these facts.

## II.        Summary of the Facts

Facts related to Delaware Charge (Case No. 17-60002-CR-HURLEY)

On August 24, 2015, a Delaware State Police Detective with the Delaware Child Predator Task Force (UC-1) was utilizing a created profile on the mobile-based, social media application "Meet24," which employs the tagline, "Feel the taste of love."   This application geo-locates and identifies other "app" users who are in physical proximity, and provides a mobile-based platform for exchanging digital images, as well as voice and text messages.   The application also notifies a user when other users view their profile.   A search of publically available databases revealed that Meet24 is hosted by a company in Germany.   This same search revealed that the individual who registered the website and who is listed as the "Administrator" resides in the Ukraine.

UC-1's Meet24 profile described UC-1 as a 14-year-old female from the Hazlett, Delaware area.   UC-1 received a notification that a user "Rob" was viewing UC-1's profile and was subsequently contacted by a user with the screen name of "Rob."   The Meet24 profile of "Rob" listed him as a 30-year-old male from Starkey Corner, Maryland.   The user "Rob" was the defendant, Lee Robert Moore. UC-1 and the defendant engaged in an online communication via Meet24, during which UC-1 informed the defendant that UC-1 lived with her Mom and was currently in school.   During the chat, the defendant asked what types of clothes UC-1 liked to wear.   The defendant also stated that he was chatting while he was taking a shower and asked what UC-1 liked to wear to bed.   The defendant sent UC-1 a picture of a middle-aged male and stated it was a photo of himself.   At the end of this chat session, UC-1 asked the defendant if he wanted to chat on the social media application, "Kik," which allows users to communicate online

2

via a chat function and to exchange images and videos with other users.   The defendant agreed and provided his Kik profile of "Rob N/A."

On August 26, 2015, UC-1 was contacted via the Kik application by the defendant. During this chat session, the defendant told UC-1 that he wanted to meet her in person and asked where she lived.   UC-1 informed the defendant that she lived near the Dover Air Force Base. The defendant discussed meeting with UC-1 and subsequently requested that UC-1 wear a skirt when they met.

On August 31, 2015, the defendant and UC-1 chatted via the Kik application.   During this session, the defendant initiated a conversation about sex and UC-1's prior sexual experiences. The defendant asked if UC-1 masturbated and stated that when they met in person, he wanted to make UC-1 have several orgasms.   The defendant further stated that he would like UC-1 to perform oral sex on him and in return he would perform oral sex on UC-1 and penetrate her digitally.

During the chat, the defendant requested that UC-1 provide him with a photo focusing on UC-1's lips and mouth.   The defendant sent UC-1 a photograph of himself lying on a bed.   UC-1 sent the defendant a photograph of an actual female who appears to be a young teen.   During the chat, the defendant became suspicious as to the actual identity of UC-1.

On September 24, 2015, a second Delaware State Trooper, who is female (UC-2), assumed the role of UC-1 in the online communication with the defendant.   At approximately 3:26 p.m., on September 24, 2015, the defendant and UC-2 chatted via the Kik application.   During this chat session, the defendant sent UC-2 a video of himself.   In the video, the defendant can be seen in what appears to be a small room wearing what appears to be a tactical vest and a baseball-style hat

with sunglasses.   The video portrays the defendant in a small room waving at the camera.   The defendant stated in the online chat with UC-2 that he was on break and had to go relieve someone.

On September 24, 2015, at approximately 3:28 p.m., at the defendant's request, UC-2 provided the defendant with a photograph of herself.   This photograph appears to depict a young female teenager.   The defendant responded:   "you look cute . . . Now do a video."   UC-2 then sent a video of herself, which appears to depict a teenage female holding a small cat near her face. During the chat, the defendant stated that he was "sitting in the break room" and "had 5 minutes [to chat]" before he had "to go relieve someone else to go on break."

On September 28, 2015, at approximately 4:00 p.m., the defendant and UC-2 chatted via the Kik application.   During this chat session, the defendant states that he is "at work," and approximately 30 minutes later, the defendant writes that he is "on break now" and asks what UC-2 is currently wearing.   The defendant and UC-2 discuss taking a motorcycle ride together and the defendant asks UC-2 what would make her more nervous: "riding on the motorcycle with me or having sex with me?"   Their conversation ensued for approximately 40 minutes, during which the defendant and UC-2 discussed sexual contact with each other and a possible meeting. Excerpts from that conversation include:

| | | |
|---|---|---|
| 09/28/2015 16:30:11 EDT | Moore | Nice, I wish I were there right now |
| 09/28/2015 16:30:31 EDT | Moore | I'd carry you to your bedroom though |
| 09/28/2015 16:30:39 EDT | Moore | Lay you down on the bed |
| 09/28/2015 16:30:43 EDT | UC-2 | Carry me? Lol |
| 09/28/2015 16:30:47 EDT | UC-2 | Oo |
| 09/28/2015 16:31:05 EDT | Moore | Yes, carry you with your legs wrapped around me |

4

| | | |
|---|---|---|
| 9/28/2015 16:31:17 EDT | Moore | Kissing you along the way |
| 09/28/2015 16:33:04 EDT | Moore | You cute young legs |
| 09/28/2015 16:32:32 EDT | Moore | Once I laid you down on your bed, I would slip those shorts off of you |
| 09/28/2015 16:32:57 EDT | Moore | And kiss my way up your legs |
| 09/28/2015 16:35:27 EDT | UC-2 | Do u really want to come see me? |
| 09/28/2015 16:35:30 EDT | Moore | Have you ever fingered yourself? |
| 09/28/2015 16:35:34 EDT | Moore | I do |
| 09/28/2015 16:36:02 EDT | Moore | As soon as I have a free day |
| 09/28/2015 16:37:28 EDT | UC-2 | I want to meet u...just hope i dont bore u |
| 09/28/2015 16:37:51 EDT | UC-2 | I haven't done very much |
| 09/28/2015 16:37:55 EDT | Moore | I can't imagine that |
| 09/28/2015 16:38:06 EDT | Moore | That doesn't bother me |
| 09/28/2015 16:38:15 EDT | UC-2 | ur so nice |
| 09/28/2015 16:38:30 EDT | Moore | It's nice of you to notice |
| 09/28/2015 16:39:17 EDT | UC-2 | I hope u hav a free day soon |
| 09/28/2015 16:41:16 EDT | Moore | Me too, haha, but this damn summer and fall has been Awful |
| 09/28/2015 16:42:15 EDT | UC-2 | Ugh i hope i get to see u |
| 09/28/2015 16:43:49 EDT | Moore | Breaks over |

On October 5, 2015, at approximately 5:17 p.m., the defendant and UC-2 chatted via the Kik application.  During this chat session, the defendant states "that works sucks today" and further informs UC-2 that he is "[s]itting at box office style booth checking ID's for entrance into

a building."   The defendant further asks what UC-2 is wearing and requests that UC-2 send him something "exciting."   The defendant tells UC-2 that he is wearing "black tactical pants, a long sleeve polo, and my vest."   At the defendant's request, UC-2 sent the defendant a photograph of herself.   This picture appears to depict a young teenage female holding a small cat.

On October 6, 2016, at approximately 7:37 p.m., the defendant and UC-2 chatted via the Kik application.   During this chat session, the defendant states that he is getting ready to zip up his pants after arriving home from work.   The defendant sends UC-2 a picture of his lower body from the waist down, with his jeans unzipped.   The defendant then asks UC-2 if she will "take a picture for me in your panties" if he "pushes [his] boxers down."   After UC-2 responds, "Yes maybe," the defendant then sends a photograph depicting an adult male holding his underwear down below his exposed scrotum and erect penis.   The chat then continued as follows:

| | | |
|---|---|---|
| 10/06/2015 19:43:51 EDT | Moore | You like? |
| 10/06/2015 19:44:48 EDT | UC-2 | Yea lol |
| 10/06/2015 19:45:07 EDT | Moore | What do you like about it? |
| 10/06/2015 19:50:12 EDT | UC-2 | Idk haha i haven't seen many |
| 10/06/2015 19:57:14 EDT | Moore | I'm imagining you on your knees in front of me with you hand wrapped around it, staring at it, and looking up at me, and then putting it in your mouth |
| 10/06/2015 19:58:44 EDT | Moore | Do you think it's big? |
| 10/06/2015 19:58:07 EDT | UC-2 | I'm nervous haha but excited |
| 10/06/2015 20:01:15 EDT | Moore | Well go to your bedroom, or the bathroom, and take off your pants |
| 10/06/2015 20:02:50 EDT | Moore | I do want pictures of you. As many as you will send me |

6

| | | |
|---|---|---|
| 10/06/2015 20:02:54 EDT | Moore | I love seeing you |
| 10/06/2015 20:03:16 EDT | Moore | And I do want to come see you |
| 10/06/2015 20:11:50 EDT | Moore | So what do you say, wanna show me something? |
| 10/06/2015 20:13:16 EDT | UC-2 | My mom is watching tv with me now but I'll try to sneak away nd send one |
| 10/06/2015 20:14:29 EDT | Moore | I would suggest the bathroom, that's an excusable place to go for a few minutes |
| 10/06/2015 20:48:12 EDT | Moore | I'm hard thinking about your body |

On November 6, 2015, the defendant was arrested on charges stemming from his online enticement of UC-1/UC-2 as well as his sending of obscene material, namely a photo of his erect penis, to UC-1/UC-2 whom he believed to be a minor under the age of 16.

Facts related to Florida Charges (Case No. 16-60157-CR-HURLEY)

On or about April 27, 2016, a forensic examination of the defendant's iPhone 6 revealed that the defendant had been sending and receiving email communications using the email addresses trance5o@hotmail.com and shooterready9@gmail.com. Furthermore, forensic analysis revealed several email addresses in the contact portion of the phone. These email addresses had no name or phone number associated with them. Investigation revealed that one of the email addresses was being used by a minor female residing in the Broward County, Florida (hereinafter referred to as "Minor Victim-1.") The specific email address being used by Minor Victim-1 was her name followed by aol.com.

On March 1, 2014, between 12:35:48 a.m. UTC and 12:47:40 a.m. UTC, emails between email account shooterready9@gmail.com belonging to the defendant and Minor Victim-1 were

exchanged.   One of the emails sent from Minor Victim-1's email to the defendant's email appeared to have a photograph attached to it.   However, the content of this image was not viewable on the device.

Through Delaware Department of Justice subpoenas sent to AOL relating to the email address belonging to Minor Victim-1, law enforcement identified the user of this email as a 17-year-old minor residing in Coconut Creek, Florida who was attending a local high school.

On December 15, 2015, HSI Special Agents interviewed Minor Victim-1, who was in fact residing in Coconut Creek, Florida.   Minor Victim-1 acknowledged using the email address referred to above containing her full name followed by aol.com.   Minor Victim-1 stated that she met the defendant on the social media application Kik when she was approximately 15 or 16 years old.   Minor Victim-1 remembered using her actual age on her Meet24 and Kik profile pages. She further stated that she remembered communicating with the defendant using various forms of online communication, including Kik and Meet24.   Minor Victim-1 informed law enforcement that the defendant sent her images of himself which depicted his unclothed genitals, and that, upon the defendant's request, Minor Victim-1 sent several images of herself, which depicted her unclothed genitals to the defendant using various forms of online communication, including Kik and Meet24.

Later, Minor Victim-1 voluntarily consented to a review of her Meet24 account by law enforcement.   Minor Victim-1 identified on her phone private messages she exchanged using the online social media application Meet24, specifically those that she exchanged with the user "Rob" (the defendant) between January and April of 2014.   On several occasions, the defendant sent images of his exposed, erect penis to Minor Victim-1's Meet24 account.   Furthermore, on January 11, 2014, the following chat ensued:

8

| Moore | 2014-01-11 22:55:41.0 | do you remember where we were? |
| MV-1 | 2014-01-11 22:55:55.0 | not exactly |
| Moore | 2014-01-11 22:57:36.0 | talking about us kissing, and me laying between your legs |
| MV-1 | 2014-01-11 22:59:04.0 | oh I see |
| Moore | 2014-01-11 22:59:45.0 | still wearing sweats? |
| MV-1 | 2014-01-11 22:59:55.0 | no lol |
| Moore | 2014-01-11 23:00:19.0 | what are you wearing? |
| MV-1 | 2014-01-11 23:00:27.0 | shorts and a tshirt |
| Moore | 2014-01-11 23:00:59.0 | even better |
| Moore | 2014-01-11 23:01:14.0 | nice bare legs for me to feel |
| Moore | 2014-01-11 23:02:57.0 | are you wearing panties under the shorts? |
| MV-1 | 2014-01-11 23:04:47.0 | no. |
| Moore | 2014-01-11 23:05:25.0 | mmm |
| Moore | 2014-01-11 23:05:45.0 | I want to take them off you |
| Moore | 2014-01-11 23:06:32.0 | I grab them with my hands and pull lightly down....just an inch |
| Moore | 2014-01-11 23:09:56.0 | I pull them further down.... |
| Moore | 2014-01-11 23:10:43.0 | almost revealing you... |
| Moore | 2014-01-11 23:16:19.0 | can I keep going? |
| MV-1 | 2014-01-11 23:16:23.0 | yes |
| Moore | 2014-01-11 23:16:52.0 | I pull them down your thighs, over your knees, and off your legs |
| Moore | 2014-01-11 23:17:23.0 | I kiss your calves, and work my way up |

9

| | | |
|---|---|---|
| Moore | 2014-01-11 23:17:46.0 | kissing your inner thighs, rubbing your legs with my hands |
| Moore | 2014-01-11 23:19:02.0 | I push your legs apart. look you in the eye, and place my tongue on your pussy |
| Moore | 2014-01-11 23:19:47.0 | I part your lips with my tongue. and reach inside you |
| MV-1 | 2014-01-11 23:21:00.0 | I let out a small whimper, and grip your hair |
| Moore | 2014-01-11 23:21:36.0 | I push my tongue deep inside you and lick strong licks |
| Moore | 2014-01-11 23:21:49.0 | my hands pin your legs open |
| Moore | 2014-01-11 23:23:09.0 | I lick faster, and add a finger |
| Moore | 2014-01-11 23:23:38.0 | your young pussy tastes sooo good |
| MV-1 | 2014-01-11 23:27:32.0 | mmmmm you like young pussy? |
| Moore | 2014-01-11 23:27:44.0 | I put two fingers inside you and lick your clit |
| Moore | 2014-01-11 23:27:53.0 | I love young pussy |
| Moore | 2014-01-11 23:28:40.0 | you're so wet |
| Moore | 2014-01-11 23:28:59.0 | and I am so hard |
| MV-1 | 2014-01-11 23:29:49.0 | I start moaning like crazy, begging you for more |
| Moore | 2014-01-11 23:30:29.0 | I speed up finger fucking you |
| MV-1 | 2014-01-11 23:32:04.0 | your legs wiggle around my head |
| Moore | 2014-01-11 23:32:23.0 | my cock is aching to get in on the action |
| Moore | 2014-01-11 23:34:49.0 | I pull my hand away from your pussy and climb up between your legs, my hard cock inches from your young tight pussy |
| Moore | 2014-01-11 23:35:51.0 | take me in your hand, hold it |

| | | |
|---|---|---|
| Moore | 2014-01-11 23:37:26.0 | I put the tip down at your entrance |
| Moore | 2014-01-11 23:37:38.0 | are you ready for this? |
| Moore | 2014-01-11 23:41:56.0 | I push the tip of my cock inside you |
| Moore | 2014-01-11 23:43:28.0 | I push just a few inches inside you to wet my cock with your juices...and gently move it in and out |
| Moore | 2014-01-11 23:45:51.0 | I give you a couple more inches, and feel resistance....you're very tight. are you a virgin? |
| Moore | 2014-01-11 23:47:45.0 | I keep pressing into you, hard |
| Moore | 2014-01-11 23:49:47.0 | I am almost all the way inside you |
| Moore | 2014-01-11 23:53:10.0 | fuck |
| Moore | 2014-01-11 23:55:13.0 | I'm all the way inside |
| Moore | 2014-01-11 23:55:38.0 | I can feel your inexperienced pussy quivering beneath me |

**On January 14, 2014, the following chat ensued:**

| | | |
|---|---|---|
| Moore | 2014-01-14 16:33:48.0 | does your microphone work? |
| MV-1 | 2014-01-14 16:34:02.0 | Uhm yes |
| Moore | 2014-01-14 16:34:31.0 | can you voice me something hot, like telling me how you think it'll feel when I fuck you |
| Moore | 2014-01-14 16:36:16.0 | [The defendant sends audio file] |
| MV-1 | 2014-01-14 16:36:18.0 | can I do that another time? I'm not alone |
| Moore | 2014-01-14 16:36:28.0 | absolutely |
| Moore | 2014-01-14 16:36:46.0 | are you with a girl? |
| MV-1 | 2014-01-14 16:36:53.0 | no lol |

11

| | | |
|---|---|---|
| MV-1 | 2014-01-14 16:36:58.0 | I'm home |
| MV-1 | 2014-01-14 16:36:59.0 | I'm home |
| Moore | 2014-01-14 16:37:05.0 | parents? |
| MV-1 | 2014-01-14 16:37:10.0 | yeah |
| Moore | 2014-01-14 16:37:18.0 | ahh, yeah don't play mine |
| MV-1 | 2014-01-14 16:37:33.0 | haha what does it say? |
| Moore | 2014-01-14 16:37:53.0 | I just say I want to hear your sexy voice |
| MV-1 | 2014-01-14 16:38:19.0 | ah okay |
| Moore | 2014-01-14 16:38:32.0 | I'm going to send you one more for you to listen to later |
| MV-1 | 2014-01-14 16:38:43.0 | okay :3 |
| Moore | 2014-01-14 16:39:32.0 | The Defendant sends audio file |
| Moore | 2014-01-14 16:40:01.0 | The Defendant sends audio file |
| Moore | 2014-01-14 16:40:44.0 | ok, I am rock hard now thinking about it, I want to save this for later when you are free to talk |
| MV-1 | 2014-01-14 16:41:00.0 | oh okay |
| Moore | 2014-01-14 16:43:20.0 | did you get turned on by that convo? |
| MV-1 | 2014-01-14 16:44:13.0 | yes I did |
| Moore | 2014-01-14 16:44:20.0 | wet? |
| Moore | 2014-01-14 16:44:21.0 | wet? |
| MV-1 | 2014-01-14 16:44:37.0 | a little |
| Moore | 2014-01-14 16:45:02.0 | give your pussy a discrete squeeze for me, imagine it is my hand |
| MV-1 | 2014-01-14 16:46:02.0 | yes sir |

| | | |
|---|---|---|
| Moore | 2014-01-14 16:46:35.0 | good girl |
| Moore | 2014-01-14 16:48:12.0 | are you able to excuse yourself to go to the bathroom? |
| MV-1 | 2014-01-14 16:52:18.0 | yes? |
| Moore | 2014-01-14 16:52:39.0 | are you there? |
| Moore | 2014-01-14 16:52:49.0 | alone in the bathroom? |
| MV-1 | 2014-01-14 16:53:16.0 | yes.. |
| Moore | 2014-01-14 16:53:44.0 | pull your panties down and put a finger inside. imagine it is me |
| Moore | 2014-01-14 16:54:47.0 | would you take a picture? Preferably down there but of your open mouth would be nice too |
| Moore | 2014-01-14 17:03:19.0 | nervously awaiting a response |
| MV-1 | 2014-01-14 17:03:52.0 | a finger? or normal? |
| Moore | 2014-01-14 17:05:14.0 | whatever you want |
| Moore | 2014-01-14 17:05:35.0 | I'd love to see your pussy |
| MV-1 | 2014-01-14 17:12:19.0 | did that send? |
| Moore | 2014-01-14 17:12:32.0 | no, try again |
| MV-1 | 2014-01-14 17:12:53.0 | MV-1 sends a pic (law enforcement has so far been unable to retrieve but MV-1 stated that she took a picture of her naked vagina and sent it to the defendant at his request.) |
| Moore | 2014-01-14 17:13:40.0 | mmmm |
| Moore | 2014-01-14 17:14:21.0 | very nice |
| Moore | 2014-01-14 17:14:50.0 | anything else? |

| MV-1 | 2014-01-14 17:15:09.0 | what else is there lol |
| Moore | 2014-01-14 17:15:18.0 | your tongue |
| MV-1 | 2014-01-14 17:17:20.0 | lil busy now I will later |
| Moore | 2014-01-14 17:17:39.0 | alright |
| Moore | 2014-01-14 17:17:44.0 | I will also ttyl |
| MV-1 | 2014-01-14 17:22:41.0 | okay |

The communications between the defendant and Minor Victim-1 occurred using cell phones and the internet, both of which are facilities of interstate commerce. Minor Victim-1 was located in the Southern District of Florida during the time that the defendant enticed her. The defendant was located outside of the Southern District of Florida at all times during their conversations, namely in the District of Columbia as well as the District of Maryland.

<u>Facts related to additional uncharged online enticement of minors</u>

A subsequent search warrant for the contents of the defendant's Meet24 account revealed additional similar chats that the defendant engaged in with other minor females.   For example, on January 8, 2014, the defendant began a conversation with a 14-year-old minor female located in the Northern District of Texas (hereinafter "Minor Victim-2"), whose age was clearly visible on her profile page.   Indeed, within the first five minutes of the conversation, the defendant asked Minor Victim-2, "it doesn't bother you that I am 30 does it?"   Similarly, a few minutes later, the defendant said, "I just didn't want you to think it was weird that I was into Who and wanted to talk to a 14 yr old about it."   Additionally, about a month after they first began communicating, on February 7, 2014, the defendant continued the grooming process by again referencing Minor Victim-2's age when he compared photos of her with her friend by saying "she doesn't look as mature as you though" and "you look 17, not 14."   A few days later, on February 12, 2014, the

defendant explained to MV-2 that he was "a cop" and a "federal officer to be specific."    MV-2 replied "and your talking to a child," to which the defendant quipped, "like the Rolling Stones sang 'every cop is a criminal.'"

Within a few days of their first chat, the defendant began turning the conversation sexual. For example, on January 13, 2014, the defendant told Minor Victim-2, "I would love to see you in thigh high socks and a short skirt."    By January 16, 2014, the following conversation ensued:

| | | |
|---|---|---|
| Moore | 1/15/2014 21:46 | going to bed, g'night :*:] |
| MV-2 | 1/15/2014 22:44 | goodnight |
| Moore | 1/16/2014 17:31 | you are a unicorn :) |
| MV-2 | 1/16/2014 17:31 | yush haha |
| Moore | 1/16/2014 17:31 | :$ |
| MV-2 | 1/16/2014 17:32 | c: |
| Moore | 1/16/2014 17:32 | side note: do you know the urban dictionary definition of a unicorn? |
| MV-2 | 1/16/2014 17:32 | no |
| Moore | 1/16/2014 17:33 | a bisexual girl who will go home with a couple |
| Moore | 1/16/2014 17:33 | a couple who hit on women looking for such a girl are called unicorn hunters |
| MV-2 | 1/16/2014 17:34 | 0.0. |
| Moore | 1/16/2014 17:34 | what does that face mean? are your eyes bugging out? |
| MV-2 | 1/16/2014 17:35 | yush |
| Moore | 1/16/2014 17:36 | I only know this because I have done unicorn hunting |
| Moore | 1/16/2014 17:36 | and a unicorn told me I was a unicorn hunter |

15

| | | |
|---|---|---|
| Moore | 1/16/2014 17:37 | after she came home with me and my girlfriend at the time |
| MV-2 | 1/16/2014 17:37 | da fuckkkk 0///0 |
| Moore | 1/16/2014 17:37 | over share? |
| MV-2 | 1/16/2014 17:37 | yes (/_\) |
| Moore | 1/16/2014 17:38 | sorry |
| Moore | 1/16/2014 17:38 | that is as depraved as I get |
| Moore | 1/16/2014 17:38 | so no more shockers |
| MV-2 | 1/16/2014 17:39 | childhood ruuiiiiinnnneeeeedddd!!!!!!!!!!!   DX |

The defendant continued chatting with Minor Victim-2 on a nearly daily basis between January and April 2014.   The defendant continuously turned the conversation to sexual topics. For example, on January 16, 2014, the defendant said, "don't forget, I may be a guy, and I may have the hots for you, but I also know a lot of things."    On January 21, 2014, Minor Victim-2 told the defendant that she had "self harmed" in the past by "slic[ing] my skin." A few days later, on January 29, 2014, the defendant again engaged enticed Minor Victim-2 into sexual dialogue:

| | | |
|---|---|---|
| Moore | 1/29/2014 19:52 | and I know at some point I would reach over and lay my hand just above your knee |
| MV-2 | 1/29/2014 19:53 | my leg would probably be shaking |
| Moore | 1/29/2014 19:54 | I would rub it press it down try to massage the jitters out of you |
| MV-2 | 1/29/2014 19:55 | I would probably scoot closer to you |
| Moore | 1/29/2014 19:56 | and put my hand slipped higher up on your thigh? |
| MV-2 | 1/29/2014 19:57 | huh |

| Moore | 1/29/2014 19:57 | sorry, and when my hand slipped higher up on your thigh |
| Moore | 1/29/2014 19:57 | it would be rubbing your midthigh |
| MV-2 | 1/29/2014 19:59 | *i would probably just look down at your hand* |
| Moore | 1/29/2014 20:00 | then I would probably look at you and keep sliding it up |
| Moore | 1/29/2014 20:00 | until my fingers brushed against your panties |
| MV-2 | 1/29/2014 20:01 | honestly id probably move it back down* |
| Moore | 1/29/2014 20:03 | I would ask you "too fast?" |
| Moore | 1/29/2014 20:03 | but I would not remove my hand from your thigh |
| Moore | 1/29/2014 20:03 | I would just keep rubbing where you pushed back down to |
| MV-2 | 1/29/2014 20:06 | I'd blush and say "a little" |
| Moore | 1/29/2014 20:07 | [The defendant sent an audio file] |
| Moore | 1/29/2014 20:07 | [The defendant sent an audio file] |
| MV-2 | 1/29/2014 20:08 | I'd probably just stare at you then kiss you |
| Moore | 1/29/2014 20:09 | I would just enjoy making out with you for a good long while |
| MV-2 | 1/29/2014 20:09 | I'd smack you then say drive! |
| Moore | 1/29/2014 20:11 | I might just jump over in the passenger seat on top of you and keep kissing you |
| MV-2 | 1/29/2014 20:12 | I would literally |
| MV-2 | 1/29/2014 20:12 | hit you |

1.     About 20 minutes later, undeterred, the defendant asked Minor Victim-2 "you thinking about me fingering you and you moaning" and Minor Victim-2 responded, "haha nah lol."

17

A few days later, on February 4, 2014, the defendant once again continued the enticement and tried to escalate the exchange.   Specifically, Minor Victim-2 sent a photo of herself wearing sweatpants and a shirt.   The defendant said, "love the shirt" and "I wouldn't have pictured you wearing sweatpants to school in 13 deg weather."   The defendant then asked, "what's under them?"   When Minor Victim-2 responded simply, "underwear," the defendant said "prove it." The chat logs reveal that Minor Victim-2 then sent a photo of some kind, but the photo is not viewable.   However, the defendant then responded, "damn nice" and "you have a sexy stomach." When Minor Victim-2 replied, "thanks," the defendant continued, "I'd love to rub it with my hand before I slip it down into those hot blue panties."

The next day, on February 5, 2014, after additional exchanges, the defendant again said, "I've got my hard cock out, looking at your gorgeous body."   If Minor Victim-2 were called to testify at trial, she would explain that, at the defendant's request, she sent him multiple photos of herself in various stages of undress, including photos of her pubic area, and that the defendant consistently tried to get her to take more explicit photos.   In fact, on February 26, 2014, the defendant continued to try to get Minor victim-2 to send him illicit photos of herself:

| Moore | 2/26/2014 21:15 | getting ready for bed :p |
| MV-2 | 2/26/2014 21:15 | me too |
| Moore | 2/26/2014 21:16 | mmmm, you in PJs, yum |
| MV-2 | 2/26/2014 21:16 | me in a tshirt and sweats |
| Moore | 2/26/2014 21:16 | to shirt and just panties would be better |
| MV-2 | 2/26/2014 21:17 | I feel awkward like that |
| Moore | 2/26/2014 21:17 | you would look hot like that |
| MV-2 | 2/26/2014 21:18 | I would freeze to death |

18

| Moore | 2/26/2014 21:22 | just long enough for a picture ;) |
| Moore | 2/26/2014 21:23 | I want good dreams tonight :) |
| MV-2 | 2/26/2014 21:25 | no |
| Moore | 2/26/2014 21:27 | boo |
| Moore | 2/26/2014 21:28 | well will you resend that one of you in bra and panties? so I don't have to scroll up for 10 minutes |
| Moore | 2/26/2014 21:33 | Nevermind, I got it already |
| Moore | 2/26/2014 21:34 | mmmm fuck yeah |
| Moore | 2/26/2014 21:36 | I would drive all night just to be able to pull those panties off you |
| MV-2 | 2/26/2014 21:38 | honestly I'd never let you touch me |

From January 13, 2014 to March 23, 2014, the defendant engaged in similar online enticement with another 17-year-old female (hereafter referred to as "Minor Victim-3"). For example, a mere two days after their first communication, the defendant referenced some photos of Minor Victim-3 that she had posted to her Meet24 profile page by saying "looking down at you, with you looking up with your mouth open and tongue stuck out?   I hope this doesn't offend you, but I think about you giving me head."   The defendant then encouraged Minor Victim-3 to engage in a conversation about the two of them having sex.   The conversation was extremely explicit and the defendant controlled the conversation, often with little input from Minor Victim-3.   For example, the conversation began as follows:

| MV-3 | 1/15/2014 11:58 | lol what do you want to talk about? |
| Moore | 1/15/2014 12:02 | being in your room ;) |
| MV-3 | 1/15/2014 12:02 | doin what? ;p |

19

| Moore | 1/15/2014 12:03 | locking the door |
| MV-3 | 1/15/2014 12:04 | and then? |
| Moore | 1/15/2014 12:06 | walking over to you |
| MV-3 | 1/15/2014 12:07 | and? ;3 |
| Moore | 1/15/2014 12:07 | taking my shirt off and laying down on you, and kissing you |
| MV-3 | 1/15/2014 12:08 | hehe |
| Moore | 1/15/2014 12:09 | and this makes you laugh |
| MV-3 | 1/15/2014 12:09 | no it makes me giggle |
| MV-3 | 1/15/2014 12:09 | big differents |
| Moore | 1/15/2014 12:10 | good ;) |
| Moore | 1/15/2014 12:11 | and then my hands would push your knees apart so I would lay between your legs |

A few days later, on January 21, 2014, the defendant said to Minor Victim-3, "I have a hypothetical? would you be more excited if I were fucking you in your bedroom while your parents were home and we might get caught, or in public where we might get caught?"    The defendant then commented, "love that you're 17, also a huge turn on."    The defendant further said, "god damn I so badly want to stare into your eyes the first time I put it all the way inside you" and "I would have to focus not to cum too fast in your tight young pussy."    A few minutes later, at the defendant's request, Minor Victim-3 sent a close-up photo of her vagina.    Less than a minute later, the defendant encouraged her to send him more photos by saying "nice…you should do one with your fingers spreading your lips away."

20

Just as with Minor Victim-2, the defendant also told Minor Victim-3 that he was a "federal officer in DC" after sending her a photograph of himself in uniform with a gun.

### III.     The Pattern of Activity Adjustment Was Properly Applied

Defendant has objected to Paragraph 85, the "pattern of activity" adjustment pursuant to § 4B1.5(B)(1), which provides for a 5-level upward adjustment if "the defendant engaged in a pattern of activity involving prohibited sexual conduct."  Defendant argues that his offense of conviction "involved (a) the receipt and possession of child pornography (by receiving nude pictures of minors) and (b) the transfer of obscene material to a minor (by sending nude pictures of himself to minors)." (Def.'s Br. at 5.)

In *United States v. Rothenberg*, 610 F.3d 621 (11th Cir. 2010), the Eleventh Circuit addressed a factually analogous scenario.   There, the defendant was charged and convicted of two counts: (1) attempting to induce an individual under 18 to engage in criminal sexual activity in violation of § 2422(b); and (2) possession of child pornography in violation of § 2252(a)(b). Specifically, the defendant chatted online with an undercover officer who posed as the father of an 11-year-old girl.   The defendant and the UC discussed having sex with the 11-year-old, and ultimately the defendant traveled to an agreed rendezvous point where he was arrested.   In calculating the Guidelines, the district court applied the pattern of activity adjustment based upon the transcripts of two separate chat conversations located on the defendant's devices.   In those conversations, the defendant "actively coached and encouraged other adults in graphic detail about how to sexually abuse minors in their care or under their influence." *Rothenberg*, 610 F.3d at 625. The defendant argued that the chats alone were insufficient to constitute an attempt to violate § 2422(b) because neither rose to the level of a substantial step toward commission of the offense. Ultimately, the Eleventh Circuit concluded that the defendant's chats "constituted important

actions leading to the commission of inducing particular children to engage in illegal sexual activity." *Id*. at 627.   Accordingly, it concluded that the defendant "engaged in a pattern of activity involving prohibited sexual conduct justifying application of the enhancements provided for in U.S.S.G. § 2G2.2(b)(5) and 4B1.5(b)(1)." *Id*.   The Court of Appeals further concluded that the sentence of 300 months "was both procedurally and substantively reasonable." *Id*.

    *Rothenberg* makes clear that a conviction for violating § 2422(b) by talking to a UC, combined with other examples of the defendant engaged in similar behavior with other individuals is a sufficient factual basis to conclude that the pattern of activity adjustment applies.   Arguably, the facts of Defendant Moore's case are even more compelling justification for the pattern of activity adjustment.   In *Rothenberg*, the defendant's online chats were exclusively with adults discussing the sexual abuse of children.   Here, Defendant Moore engaged in a chat with the Delaware UC who was posing as a 14-year-old child, not the parent of that child.   In *Rothenberg*, the defendant's two additional chats located on his devices revealed separate conversations with two different adults about their respective children.   Here, Defendant Moore engaged in the enticement of real juveniles by directly communicating with the juveniles, not their parents: the Florida minor (MV-1), the Texas minor (MV-2), and the Missouri minor (MV-3).

    It is beyond dispute that Defendant's offense of conviction in Count Three of the Florida case is a "covered sex crime" because § 2422(b) is contained within Chapter 117, and Application Note 2 of § 4B1.5 defines "covered sex crime" to include offenses against minors found in Chapters 109A, 110, and 117. In his brief, Defendant conspicuously omitted, (*see* Def.'s Br. at 5), the portion of Application Note 2 that referenced Chapter 117, the very chapter in which his offense of conviction is located.   Below is the entire text of Application Note 2:

    **Covered Sex Crime as Instant Offense of Conviction -** For purposes of this

guideline, the instant offense of conviction must be a covered sex crime, i.e.: (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) chapter 110 of such title, not including trafficking in, receipt of, or possession of, child pornography, or a recordkeeping offense; (iii) chapter 117 of such title, not including transmitting information about a minor or filing a factual statement about an alien individual; or (iv) 18 U.S.C. § 1591; or (B) an attempt or a conspiracy to commit any offense described in subdivisions (A)(i) through (iv) of this note.

U.S.S.G. § 4B1.5, application note 2.

To the extent Defendant argues that his attempt to get MV-1, MV-2, and MV-3 to send him nude photos amounts only to receipt and possession of child pornography, Defendant is incorrect. Indeed, Defendant repeatedly attempted to get each of these girls to *produce* sexually explicit images of themselves and send them to him. Does that constitute receipt and possession of child pornography as well? Of course, but that does not mean it ceases to be production of child pornography in the first instance.

Indeed, with regard to MV-1, Defendant admitted in the Factual Basis that on January 1, 2014, he was chatting with MV-1, asked her to go to the bathroom where she could be alone, and then, once she confirmed she was in there alone, Defendant directed her: "pull your panties down and put a finger inside. Imagine it is me. Would you take a picture. Preferably down there but of your open mouth would be nice too." About 3 minutes later, Defendant again said, "I'd love to see your pussy." Within a few minutes, MV-1 asks if the pic she tried to send came through, and Defendant ultimately responds, "mmmm. Very nice. Anything else?" This is sufficient evidence from which this Court can conclude that Defendant attempted to get MV-1 to produce child pornography.

Similarly, with regard to MV-2, Defendant admitted in the Factual Basis that on January 13, 2014, he told MV-2, "I would love to see you in thigh high socks and a short skirt." And so

goes the grooming process.   On February 4, 2014, MV-2 sent a photo of herself wearing sweatpants and a shirt. Defendant responded, "what's under them?" and when she told him "underwear," he demanded that she "prove it."   MV-2 in fact sent a photo and Defendant responded "damn nice," "you have a sexy stomach," and "I'd love to rub it with my hand before I slip it down into those hot blue panties," thereby indicating that he did receive an image of MV-2's underwear, just as he demanded.   Furthermore, the Factual Basis makes clear that if MV-2 were called to testify, she would explain that "at the defendant's request, she sent him multiple photos of herself in various stages of undress, including photos of her pubic area, and that the defendant consistently tried to get her to take more explicit photos." (Factual Basis ¶ 20.)   Yet again, on February 26, 2014, as MV-2 was trying to go to bed, Defendant attempted to get her to take more photos of herself in various stages of undress by asking her to take a picture of herself in just a t-shirt and panties.   When the child resisted, he said "just long enough for a picture ;)" and "I want good dreams tonight :)."   When she still said no, he indicated that he scrolled up in his chat history and found a photo she had previously sent, and after locating it, he said, "mmmm fuck yeah."   Again, Defendant's admission in the Factual Basis that he "consistently tried to get her to take more explicit photos," (Factual Basis ¶ 20), is ample evidence for this Court to conclude that he attempted to get MV-2 to produce child pornography thereby justifying the upward adjustment for engaging in a pattern of activity involving prohibited sexual conduct.

With regard to MV-3, Defendant also admitted in the Factual Basis that, on January 21, 2014, MV-3 sent him a close-up photo of her vagina and then, less than a minute later, Defendant encouraged MV-3 to send him more photos by saying, "nice…you should do one with your fingers spreading your lips away." (Factual Basis ¶ 22.)   To the extent Defendant has even a reasonable argument that he was merely trying to get these children to send him already produced images of

themselves, that argument is utterly eviscerated by his own request to MV-3 that she should take another picture of her vagina, but this time "with your fingers spreading your lips away." (*Id.*) There is no other reasonable interpretation other than Defendant actively attempted to get MV-3 to produce a new image, similar to the close-up of her vagina that she had just sent, but this time in even more explicit form.

Thus, this Court has ample evidence contained within the Factual Basis from which to conclude that Defendant attempted to and did engage in prohibited sexual conduct with a minor by repeatedly trying (and sometimes succeeding) to get MV-1, MV-2, and MV-3 to produce new images of sexually explicit conduct, namely the lascivious exhibition of their genitals or pubic area. These attempts to get the children to produce child pornography fall squarely within the ambit of Application Note 4(A)(ii), which declares that "the production of child pornography" constitutes "prohibited sexual conduct" as utilized in § 4B1.5(b).

Furthermore, Application Note 4(B)(i) explains that "the defendant engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." This Court has substantially more than two instances to ground its decision, but, at a bare minimum, this Court can conclude that Defendant attempted to get MV-1 to produce child pornography on January 1, 2014; Defendant attempted to get MV-2 to produce child pornography on February 26, 2014; and Defendant attempted to get MV-3 to produce child pornography on January 21, 2014.

**IV.    The ACE Study: Childhood Sexual Abuse Substantially Increases the Risk of Suicide Attempts, Alcoholism, and Illicit Drug Use.**

Defendant deserves a substantial sentence well above the minimum because his criminal conduct has a high likelihood of resulting in the premature death of his victims. While that sounds

like an assertion borne of speculation and bordering on hyperbole, there is strong scientific support to show that because of the victimization of MV-1, MV-2, and MV-3 by Defendant, they are all at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood.   First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced.   An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995-1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey.   The results were startling.   "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 AMERICAN JOURNAL OF PREVENTIVE MEDICINE 389-96 (2009).   In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).)   Indeed, when the initial

survey was conducted in 1995-1997, approximately 60% of the survey respondents were already 50 years or older.   Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be institutionalized; or be otherwise lost prior to the initiation of the ACE Study." (*Id*. 394-95.)   In addition, the survey respondents were of a population enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id*. at 394.)   Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." (*Id*. at 395.)   In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005).

First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse."   Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult women who were sexually abused in the form of intercourse as a child, were 360% more likely to attempt suicide than women who had never been sexually abused as a child. (*Id*. at 432, Table 4.)   Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called

"just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused.   Sadly, this data set does not (because it cannot) include actual suicides, which undoubtedly would increase the odds described in the study.   In addition to suicide risk, non-intercourse female child sexual abuse victims were 60% more likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems.   Even worse, intercourse victims were 90% more likely to do each. (*Id.*)

Yet another analysis of the same data looked at whether exposure to ACEs increased the risk of adolescent pregnancy and fetal death.   *See* Susan D. Hillis, et al, *The Association Between Adverse Childhood Experiences and Adolescent Pregnancy, Long-Term Psychosocial Consequences, and Fetal Death*, 113 PEDIATRICS 320-27 (2004).   Compared with women who did not report any ACEs, there was a 60% increased risk in adolescent pregnancy for those who experienced childhood sexual abuse. (*Id.* at 322.)   More disturbingly, "a strong and independent trend was observed for the association between ACE score and fetal death as the outcome of the first pregnancy." (*Id.* at 323.)   In other words, even an ACE score of 1 resulted in a 7.6% increased risk in that woman's first pregnancy resulted in fetal death. (*Id.*)   Furthermore, "[a]s the ACE score rose in these younger women, the risk of fetal death as the outcome of the first pregnancy increased." (*Id.* at 323-24.)   In sum, "the cumulative and chronic exposure to stress associated with ACEs during childhood led to an increased risk of nonviability for the infant, persisting through both the first and second pregnancies." (*Id.* at 325.)

The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse.   In this case, Defendant actively preyed on the most vulnerable of the vulnerable. That is, we as a society have concluded that children need special protection because they are

inherently vulnerable due to their age.   Defendant, however, pursued these children who had troubled backgrounds.   Without revealing too many details about their personal lives, suffice to say that MV-1 and MV-2 both had childhoods that made them easier targets for Defendant, and he capitalized on those facts.   For example, MV-2 admitted to Defendant that she had engaged in self-harm before, namely "slic[ing] my skin]," a process by which one who uses sharp objects to cut her own skin to the point of bleeding.   As Defendant acknowledged in the Factual Basis, after learning this fact about MV-2, he continued to engage in the enticement of her, saying such things as "you thinking about me fingering you and you moaning."

While the problems in their early lives may not be attributable to Defendant, the ACE studies make clear that it is an accumulation of factors, including Defendant's specific conduct, that mean his child victims are now at a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems.   In addition, they are at substantially greater risk of getting pregnant as an adolescent, and, independent of when they get pregnant, they are each far more likely to have their first or second pregnancy end in the death of the baby before birth. Finally, there is an increased chance that each of this girls, MV-1, MV-2, and MV-3, will die 20 years early, all because Defendant repeatedly chose to use them as a sexual object for his own base gratification.   In short, Defendant has forever impacted these children's lives in ways that have significant long-term health consequences, and thus his criminal conduct will redound to their detriment in profound ways.   Section 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added).   Therefore, a sentence of imprisonment significantly above the minimum would be both reasonable and appropriate - "just punishment" in § 3553(a) language - given the lifelong consequences that each of these victims will likely experience due to

Defendant's repeated and reprehensible acts.

### V.    Military and Public Service are not Mitigating Factors

The military service by Defendant, along with his public service as United States Secret Service Uniformed Officer, are well known to this Court.   Defendant has consistently sought to capitalize on that service in an effort to receive a more favorable outcome in this case than he otherwise deserves. (*See* Def.'s Mot. for Downward Departure at 1-4.)   He has even succeeded in getting current and former military service members, as well as his family, to write letters to this Court touting his virtues as a veteran. (*See* Doc. 78, Family & Friends letters.)   Those who serve our country deserve tremendous credit for the sacrifices they make, but no such service grants a person *carte blanche* to engage in criminal sexual conduct with a child or children.

Indeed, the military values duty, honor, and country.   Key among these, however, is honor. That is why military discharges are characterized by type of service – honorable vs. dishonorable. Without honor, a soldier, sailor, airman, or marine is no more than a thug with a gun.   Defendant's discharge from the military was honorable, meaning his service, as it was known to those in charge, was honorable.   But there is nothing honorable about sexually exploiting children.   There is nothing honorable about manipulating unusually vulnerable young girls to engage in sexually explicit activity for the sole purpose of helping you masturbate to climax.   There is nothing honorable about grooming a child, who has admitted that she engages in suicidal behavior, while pleasuring yourself.   This defendant is therefore without honor, and thus, to the extent that he tries to use military and public service as a mitigating factor, he should be ashamed and embarrassed.

Regardless of the propriety of seeking lenience based upon military service, the Guidelines actually do not permit a departure on this basis because Defendant has pled guilty to a crime involving children.   As the Sixth Circuit has observed, "Congress has specifically instructed that

child crimes and sexual offenses are to be treated differently than other types of crimes" inasmuch

as the "the 'sole grounds' permissible for a downward departure are those 'expressly enumerated'"

in Part K of Chapter 5 of the Guidelines. *United States v. Reilly*, 662 F.3d 754, 758–59 (6th Cir.

2011).   The relevant text from § 5K2.0 is as follows:

> The grounds enumerated in this Part K of Chapter Five are the sole grounds that
> have been affirmatively and specifically identified as a permissible ground of
> downward departure in these sentencing guidelines and policy statements.  Thus,
> notwithstanding any other reference to authority to depart downward elsewhere in
> this Sentencing Manual, a ground of downward departure has not been
> affirmatively and specifically identified as a permissible ground of downward
> departure within the meaning of section 3553(b)(2) unless it is expressly
> enumerated in this Part K as a ground upon which a downward departure may be
> granted.

U.S.S.G. § 5K2.0(b).   The grounds enumerated in § 5K include "substantial assistance" (§ 5K1.1);

"victim's conduct" (§ 5K2.10); "lesser harms (§ 5K2.11); "diminished capacity" (§ 5K2.13);

"voluntary disclosure of offense" (§ 5K2.16); and "specific offender characteristics" (§ 5K2.22—

cross-referencing to §§ 5H1.1 and 5H1.4, but *not* 5H1.11).   Those are the sole bases for downward

departures in cases such as this involving the exploitation of children.

Indeed, the *Reilly* court further explained that "[n]either a defendant's lack of prior criminal

history nor his or her military service are enumerated in § 5K.   Accordingly, although these

considerations are permissible grounds of departure for other types of crimes, these two factors are

specifically excluded from consideration for child crimes and sexual offenses." *Reilly*, 662 F.3d at

758–59.   Thus, this Court should refrain from granting Defendant's motion based upon military

service because to grant it would violate both the text of the Guidelines and the intent of Congress.

*See id.* (affirming district court's decision not to grant defendant's motion for downward departure

in child sex case based upon military service).

Even if this Court concludes that § 5K2.0 does not prohibit basing a variance on § 5H1.11,

Defendant does not deserve a downward variance because he fails to meet the plain meaning of the language in that section.   The very terms of § 5H1.11 suggest that Defendant is undeserving because it only provides for a departure when the defendant's military service "is present to an unusual degree and distinguishes the case from the typical cases."   Thus, it is not true that *all* military service warrants a departure, but instead only such service that is unusual.   Here, Defendant has not put forward any facts that suggest that his military service was particularly unusual and thus worthy of downward departure.   Indeed, in his memorandum, Defendant explains that he was in the Marines for about 3-4 years, and then attended the Naval Academy. But as this Court might recall from the suppression hearing, Defendant admitted that he flunked out of the Academy.   His overseas tours were in non-combat roles in Japan and South Korea, neither of which was in any kind of active conflict during the time he was there.

In *United States v. Dais*, 559 F. App'x 438, 449 (6th Cir. 2014), the Sixth Circuit observed that although "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service," *Porter v. McCollum,* 558 U.S. 30, 43 (2009), awarding a downward departure based solely on military service is not automatic." (citing U.S.S.G. § 5H1.11 ("Military service *may* be relevant in determining whether a departure is warranted.").   An example of unusual military service includes *United States v. Lett*, 483 F.3d 782, 783 (11th Cir. 2007), where the defendant served 14 years in the Army, did combat tours in Operation Iraqi Freedom, was honorably discharged, then committed 7 drug deals over a 5-week period, felt guilty, so he withdrew from the criminal conspiracy and then re-enlisted in the military before he was ever even aware that he was going to be charged with a crime.   Defendant's service and criminal conduct are substantially different from the defendant in *Lett*.   Defendant Moore spent about three years in the military (not 14), he served in non-combat roles in non-hostile countries (not Operation Iraqi Freedom), his

crimes against these children occurred about 14 years after he exited the military (not immediately after discharge in state of PTSD), he stopped exploiting children only upon being caught (not upon a guilty conscience that stopped himself), and he did not re-enlist in the military to get himself right with his own moral compass.

Other courts have denied downward variance requests for military service that far exceeds Defendant Moore's service. *See United States v. Bordeaux*, 674 F.3d 1006, 1008 (8th Cir. 2012) (denying downward variance for defendant who served in Vietnam, suffered PTSD, and was exposed to Agent Orange during his service); *United States v. Arnold*, 263 F. App'x 507, 511 (7th Cir. 2008) (affirming statutory *maximum* sentence for defendant who had been honorably discharged from the military, then re-enlisted, and was serving in Iraq when he engaged in online enticement of two different undercover agents posing as children and one actual child); *United States v. Robinson*, 516 F.3d 716, 719 (8th Cir. 2008) (affirming district court's denial of downward variance for defendant who served 25 years in the military); *United States v. Stange*, 225 F. App'x 618, 619 (9th Cir. 2007) (affirming district court's denial of downward variance for defendant for suffered PTSD from Marine service); *United States v. Given*, 164 F.3d 389, 395 (7th Cir. 1999) (affirming district court's conclusion that even though defendant's military service was "exemplary" it was many years before the crimes he committed and not so extraordinary as to justify downward variance); *United States v. Peters*, 978 F.2d 166, 171 (5th Cir. 1992) (holding that court was "not persuaded that [defendant's] military service and receipt of two purple hearts and a distinguished flying cross compel a departure from the sentencing guidelines"); *see also United States v. Manuel*, 208 F. App'x 713, 715 (11th Cir. 2006) (departing *upward*, in bank robbery case, from 97 months to 168 months, but concluding that defendant's extensive military service warranted the 168 months instead of the court's originally intended 180-month sentence);

33

*United States v. Griffin*, 418 F. App'x 574, 577 (8th Cir. 2011) (affirming *upward* variance for bank robber who presented mitigating evidence regarding military service in Iraq and PTSD).

Indeed, courts have even reversed and remanded for resentencing where the military service was not out of the ordinary. *See United States v. Jared*, 50 F. App'x 259, 261–62 (6th Cir. 2002) (remanding for resentencing where district court improperly granted downward variance for ordinary military service of 2 years that occurred nearly 25 years before the crime for which he was convicted); *United States v. Winters*, 105 F.3d 200, 209 (5th Cir. 1997) (finding that defendant's two Purple Hearts did not take "the case out of the heartland of cases" to justify the downward variance the district court improperly granted); *United States v. Neil*, 903 F.2d 564, 566 (8th Cir. 1990) (remanding for resentencing where district court granted variance for defendant who served 11 years as military recruiter finding that such service was "not meaningfully distinguishable from the work history of steadily employed individuals holding responsible positions in the civilian work force").   Thus, this Court should deny on the merits Defendant's motion for a downward variance based upon his military service that was not out of the heartland of military experience.

Every night, Defendant crawled into the bedrooms of these girls, many times while their parents were home, and sexually assaulted them without their parents' knowledge.   His means of breaching entry into their respective houses was electronic, and in a form that minimized detection for an extended period of time.   His method of assault was persuading them to use their own hands on themselves for his masturbatory benefit.   But violate the sanctity of their homes and bedrooms he did all the same.   Certainly, all parents view this type of victimization of their children as a violation of the security they thought they maintained inside the home; and Defendant was precisely the kind of predator they were trying to guard against.   It is particularly galling that

Defendant was himself an armed guard at the single most important residence in our constitutional republic, yet he repeatedly used that guard booth to take photos of his penis and send them to underage girls.

It is disgraceful for Defendant to hide behind service ribbons.   He should have the strength of character to man up to the bar and pay the tab.   He is no longer an Officer.   He no longer deserves to be called "Officer Moore."   He should not hide behind service ribbons.   We can thank him for his service.   We should facilitate his ability to receive disability payments from the VA. But this Court should send this man to prison for a term substantially above the minimum, for he dishonors every man and woman who has ever worn the uniform or carried this country's flag into battle.

## VI.    A Significant Sentence Is Reasonable On These Facts

In thinking about the relative culpability of Defendant, it is important to recall that Congress created the range of 10-Life for a single *attempted* violation of § 2422(b).   In other words, in Congress's estimation, a defendant who commits *one attempted* enticement of a *seventeen*-year-old who was actually a cop in an undercover capacity would be subject to a sentence between 10 years and life imprisonment.   Here, by contrast, we have *multiple* actual enticements of three different victims, as well as an attempt with the UC.   As the *Rothenberg* Court made clear, a sentence of 300 months was substantively reasonable for a man who attempted to entice the UC posing as an adult parent of a child, and for two additional chats between the defendant and two other parents of children.   By contrast, here, Defendant Moore attempted to entice the 14-year-old UC, *and actually* enticed a 17-year-old in Florida, a 14-year-old in Texas, and another 17-year-old in Missouri.   Thus, a significant sentence well above the Guidelines is appropriate on these facts.   *See also United States v. Korfhage*, No. 16-13209, 2017 WL 1208399,

at *1 (11th Cir. Apr. 3, 2017) (affirming 240-month sentence for enticement of 17-year-old girl; without pattern of activity facts); *United States v. Syed*, 616 F. App'x 973 (11th Cir. 2015) (affirming 294-month sentence for attempted enticement of UC posing as a 14-year-old girl; with pattern of activity facts); *United States v. Anderson,* 509 F. App'x 868, 871 (11th Cir. 2013) (affirming 324-month sentence for attempted enticement of UC posing as father of two children; without pattern of activity facts); *United States v. Bowden*, 420 F. App'x 907 (11th Cir. 2011) (affirming 250-month sentence for attempted enticement of UC posing as the mother of a child, and without pattern of activity facts); *United States v. Friedlander*, 395 F. App'x 577, 582 (11th Cir. 2010) (affirming 360-month sentence for attempted enticement of two minors).

Defendant points to this Court's sentence of 120-months in *United States v. Asseraf*, 16-CR-60234, Doc. No. 47 (S.D. Fl. Mar. 23, 2017) as a reasonably comparable case. (Def.'s Mot. for Downward Departure at 7, Doc. No. 79.)   But Defendant neglects to point out that Asseraf violated § 2422(b) *once* by communicating with an undercover agent about sexually abusing the UC's fictitious child.   The defendant in *Asseraf* also did not admit in his Factual Basis to engaging in this same kind of behavior with three additional real children, as Defendant has admitted. Indeed, *Asseraf* is the quintessential baseline example for which the 120-month sentence should apply: A single instance of attempting to entice the parent of a child.   Here, in stark contrast, Defendant Moore committed the same offense as the defendant in *Asseraf* when he texted with the Delaware UC agent, which would justify a 10-year sentence on its own.   But Defendant had also engaged in this behavior no less than three times in the past with three different children.   Even by his own reference, it is beyond peradventure that Defendant's sentence must substantially

exceed that of the defendant in *Asseraf*.[1]

Indeed, even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children, scholarly research in this area demonstrates that sexual predators like Defendant will simply change their *modus operandus*. Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 LAW & PSYCHOL. REV. 153 (2008) ("Generally, older sex offenders engage in more passive sexual activity as compared to their younger counterparts. For example, fondling by elderly offenders is more prevalent than intercourse. Research has shown that elder offenders are more likely to commit 'nonviolent' sexual offenses such as pedophilia or exhibitionism as opposed to 'violent' offenses such as forcible rape. Specific examples of these 'nonviolent' offenses include improperly touching an acquaintance, statutory rape, exposing of the genitals (usually to a minor), and other acts of exhibitionism.")   Defendant's repeated enticement of numerous children demonstrates that he has a deviancy that has and will continue to put the community at risk regardless of his age.

If nothing else, this Court should reject any consideration of a sentence that would return Defendant to his children's lives before they reach the age of majority because letting him enter back into their lives when they are adolescents (13-17) is the most dangerous situation for those children because that is the age group that Defendant targeted on multiple occasions.   At the very least, his children should be allowed to grow up without risk of him perpetrating a crime on them when they reach his preferred age.   Accordingly, a sentence substantially above the minimum is

---

[1] Defendant only cites one other case in his "disparity" section, and that was a Florida state case from 1968 that cannot reasonably be used as a comparison in federal court with different statutes, elements, and Guidelines in 2017. Indeed, the mere fact of the stretch to this case for comparative purposes, without any citation to federal cases within the Eleventh Circuit that have addressed more factually analogous cases, suggests that Defendant knows he is grasping at straws in trying to articulate how he deserves a sentence even remotely close to the minimum.

imperative to adequately protect the community - indeed, his own children - from Defendant.

## VII.    Conclusion

This Court has the opportunity to bring security to the community by guaranteeing that it never has to worry about this child predator again.   This Court also has the opportunity to provide Defendant's victims a chance at finding peace and closure by ensuring that Defendant receives the most severe punishment allowed under the law so that each of the victims is likewise ensured that Defendant may never harm them again.

Defendant abused these girls over the course of several months, but in so doing, he saddled them each with a heavy load they will shoulder throughout their lifetimes.   To really know them will be to know about the Defendant, what he did to them, and the embarrassment and shame he caused them.   Forevermore, they will remember this moment in time; when they meet new friends, begin dating, and hopefully, someday have their own children.   It is a burden that Defendant has saddled them with for the rest of their lives.   Their lives are forever changed in the most profound ways; his life should be behind bars where children cannot be further harmed by him.

Respectfully submitted,

BENJAMIN G. GREENBERG
Acting United States Attorney

*/s/ Corey Steinberg*
COREY STEINBERG
Assistant United States Attorney
Florida Bar No. 0563234
500 Broward Blvd. 7th Floor
Fort Lauderdale, Florida 33394-3016

*/s/ Austin M. Berry*
Austin M. Berry
Trial Attorney

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was filed Monday, May 15, 2017 via CM/ECF, which will cause a copy to be sent to Defendant's Attorneys.


*/s/ Corey Steinberg*
COREY STEINBERG
Assistant United States Attorney